UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

---

IFTIKHAR ISA AHMED,
a/k/a JAMES LUNDQUIST,

        Plaintiff,

    v.

ROBERT FENEIS,
JOE W. COSGROVE, and
RALPH FLESHER,

        Defendants.

Civil No. 05-2388 (JRT/FLN)

**REPORT AND RECOMMENDATION**

---

Plaintiff, a prisoner of the State of Minnesota, has brought this action under 42 U.S.C. § 1983, claiming that Defendants violated his constitutional rights while he was incarcerated at the Minnesota Correctional Facility in Rush City, Minnesota, ("MCF-RC"). Defendants have filed a motion for summary judgment, which is supported by a memorandum, an affidavit and various exhibits. (Docket Nos. 52-54.) Plaintiff has opposed Defendants' summary judgment motion by filing a pro se "Response to Memorandum in Support of Motion for Summary Judgement." (Docket No. 57.)

This matter has been referred to this Court for a report and recommendation under 28 U.S.C. § 636 and Local Rule 72.1. For the reasons discussed below, it will be recommended that Defendants' summary judgment motion be granted, and that this action be dismissed with prejudice.

## I. FACTUAL BACKGROUND

In November 1997, Plaintiff pled guilty in the state district court for Ramsey County, Minnesota, to charges of second-degree murder and second-degree

assault. He was sentenced to 306 months in state prison.  <u>Lundquist v. State</u>, No. CX-99-1430 (Minn.App. 2000), 2000 WL 310356, (unpublished opinion) at *1, <u>rev. denied</u>, May 23, 2000.  Plaintiff was serving his state prison sentence at MCF-RC at all times relevant to the present action, and he is still incarcerated there at this time.

Plaintiff's "Work Assignment History Report" shows that he arrived at MCF-RC in April 2005.  (Ex. 13.[1])  During his first few months at MCF-RC, Plaintiff did not have any prison work assignment; but in August 2005, he was assigned to a job in the prison kitchen.  (<u>Id</u>.)

The kitchen at MCF-RC is operated by a private vendor known as "CWF." (Wolfe Aff., ¶ 14.)  Although CWF employees are not directly employed by the Minnesota Department of Corrections, ("DOC"), they "have the same authority regarding management of offender workers while working in the kitchen that DOC staff have."  (<u>Id</u>.)[2]

Plaintiff's current lawsuit stems from an incident that occurred while he was working in the MFC-RC kitchen on September 2, 2005.  At approximately 10:30 that

---

[1]  Much of the evidence currently before the Court comes from the Affidavit of Susanne Wolfe, (hereafter "Wolfe Aff."), and the exhibits submitted with that Affidavit. (Docket No. 54.)  Except as otherwise noted, all of the exhibits (or "Ex.") referred to hereafter are the exhibits submitted with Wolfe's affidavit.  Thus, the "Work Assignment History Report," referred to in the text as "Ex. 13," is Exhibit 13 of Susanne Wolfe's affidavit.

[2]  All parties apparently have assumed that CWF employees who work at MCF-RC can be considered to be "state actors" for purposes of 42 U.S.C. § 1983; and for present purposes the Court will join in that assumption.

morning, two CWF employees, Michele Otterness and Sheila Hanzalik, were walking through the kitchen on their way to a break.  As they passed by Plaintiff, he said to Otterness, "Where were you!  Taking a shit?"  (Ex. 1.)  Hanzalik told Plaintiff that his remark was "totally inappropriate," and she then reported the incident to a correctional officer named Calvin Stenlund.  (Ex. 2.)  After interviewing both Otterness and Hanzalik, Officer Stenlund removed Lundquist from the kitchen, and informed him that his kitchen work assignment was terminated, and he was being placed in segregated confinement, because of his inappropriate comments to the CWF staff.  (Ex. 3, 4.)

Later that day, Plaintiff sent a "kite," (an informal grievance form), to Defendant Ralph Flesher, a CWF employee who was working as the Food Service Director at MCF-RC.  (Ex. 5; Wolfe Aff., ¶ 15.)  In that kite, Plaintiff claimed that he had spoken to Otterness as he did, because he was concerned that she had been to the bathroom, and was returning to work without washing her hands.  He further claimed that his job termination resulted from "discrimination."  To support his discrimination claim, Plaintiff cited an incident involving another inmate who had recently been disciplined for misconduct while working in the kitchen at MCF-RC. Plaintiff contended that he had not been treated the same as the other inmate. (Ex. 5, 6.)  In response to Plaintiff's kite, Flesher indicated that he believed Plaintiff had been rude and disrespectful, and that Plaintiff had been properly removed from his work assignment.  (Ex. 6.)

3

Plaintiff later wrote a series of kites to other officials at MCF-RC, including Defendant Joe W. Cosgrove, an Associate Warden who was responsible for overseeing the kitchen area at MCF-RC. He also sent kites to Defendant Robert Feneis, the Warden at MCF-RC. (Ex. 7.) In those various kites, Plaintiff continued to complain about the termination of his job assignment, and he continued to claim that he was terminated due to "discrimination."

On September 12, 2005, Defendant Cosgrove responded to Plaintiff's kites in a written memorandum. (Ex. 9.) Cosgrove indicated that after conducting his own investigation, he found that Plaintiff's "comments to the [CWF] staff were rude, disrespectful and insulting and the termination was appropriate." (Id.) On September 22, 2005, Defendant Feneis sent a memorandum to Plaintiff, which indicated that Cosgrove's decision could not be appealed. (Ex. 10.) When Feneis received another kite from Plaintiff, he reiterated that Cosgrove's ruling on the job termination appeal was final. (Ex. 7.) In response to Plaintiff's continuing claims of discrimination, Feneis added: "Each case is unique. I will not discuss or compare another offender's job situation with yours." (Id.)

Plaintiff's Work Assignment History Report indicates that he was ineligible for any work assignment from September 2, 2005, (the date when he was removed from his kitchen job), until November 2, 2005. (Ex. 13.) He then became eligible for a new job assignment, and by November 7, 2005, he was working at a new job. (Id., Wolfe Aff., ¶ 8.)

4

Plaintiff completed and signed his original complaint on September 25, 2005. (Docket No. 1.)  He filed that complaint on October 12, 2005, which was several weeks before he regained his eligibility for job assignments.

As previously mentioned, Plaintiff is presently attempting to sue Defendants under 42 U.S.C. § 1983, for allegedly violating his federal constitutional rights.  He claims that he was deprived of his constitutional right to due process, because he was removed from a job assignment without being afforded the procedural protections of due process.   He also claims that Defendants violated his constitutional right to equal protection.

Plaintiff's equal protection claim is based on allegations of racial and religious discrimination.   Plaintiff has not identified his race or religion in his amended complaint,[3] or in his response to Defendants' summary judgment motion.  However, it appears from Defendants' submissions that Plaintiff's race is "Asian," and his religion is "Islam," (Ex. 12); and Plaintiff has filed an affidavit in which he refers to himself as a "Pakistani-Muslim."   (Affidavit in Support of "Statement of Claim," [Docket No. 10], p. 3.)

Plaintiff's equal protection claim is not supported by any direct evidence showing that any of the named Defendants harbors any explicit animus toward Asians or Muslims in general.  Instead, the equal protection claim is based solely on

---

[3]  Plaintiff's original complaint was superceded by an amended complaint that was filed on December 16, 2005.  (Docket No. 12.)

the fact that Plaintiff was disciplined differently from two other White non-Islamic inmates who were guilty of misconduct while working in the kitchen at MCF-RC. Those two inmates are Troy Scott and Scott Lange.

Troy Scott began to work in the kitchen at MCF-RC on or about August 1, 2005. (Ex. 16.) On August 19, 2005, Scott falsely told a CWF employee named Tony Just that he (Scott) had been pinched on the bottom by a female CWF employee named Kathy Glidden. Scott quickly admitted to Just that this accusation was untrue, but he also said to Just, "You can have Kathy, I'll take Jill." Just apparently took offense at this remark, and he reported it to a correctional officer named Betty Bongaarts. Bongaarts in turn reported the incident to Lieutenant Nate Bartz, and Bartz ordered Scott to be removed from the kitchen and placed in a holding cell. (Ex. 17.)

Bartz later initiated formal disciplinary proceedings against Scott, and put him on "detention status," pending resolution of the disciplinary charges against him. (Ex. 17.) On August 22, 2005, Scott pled guilty to a charge of "disorderly conduct." The presiding disciplinary officer, Lieutenant Maddox, imposed a 15-day "sentence" of segregated confinement, which apparently was suspended, provided that Scott did not commit any further offenses during the next 90 days. (Ex. 18.) Scott's Work Assignment History Report indicates that he returned to his kitchen job on the day that he pled guilty – August 22, 2005. (Ex. 16.) However, that Report further indicates that Scott was removed from his kitchen job on September 21, 2005, and

6

he remained ineligible for any work assignment until November 14, 2005.

Defendants claim that Scott, like Plaintiff, was barred from working for 60 days because of his misconduct in the kitchen area. (See Defendants' "Memorandum In Support Of Motion For Summary Judgment," [Docket No. 53], p. 16.) Plaintiff vehemently denies this assertion, describing it as "a blunt lie to misrepresent the facts to the court." (Plaintiff's "Response to Memorandum in Support of Motion for Summary Judgement," p. 1.) However, Plaintiff does not deny that Scott was prohibited from working, and he has not suggested any reason for Scott's work layoff aside from his misconduct in the kitchen. In any event, the disagreement over the reason for Scott's layoff cannot be resolved here, because the existing evidence offers no clear explanation as to why Scott was ineligible for a work assignment between September 21, 2005, and November 14, 2005. As discussed more fully below, this dispute does not preclude the granting of Defendants' motion for summary judgment.

The other matter cited in support of Plaintiff's equal protection claim, involving inmate Lange, arose on September 3, 2005.   On that date, Lange allegedly threatened to assault another inmate following a dispute in the MCF-RC kitchen area, where both inmates were then working.   The next day, the inmate who had been threatened by Lange reported the matter to CWF employee Kathy Glidden. She advised the inmate to talk to Nancy Rager, a correctional officer who was working in the kitchen area.   The inmate did talk to Rager about Lange's threats, and Rager passed the information along to another correctional officer, Mark Heinecke. After interviewing the inmate who reported the threat, Heinecke recommended to the

7

"Watch Commander," Lieutenant Scherder, that Lange should be suspended from his kitchen job, pending further review of the incident.  The following day, September 5, 2005, Lange was suspended from his kitchen job, apparently by a CWF employee named Lorraine Schultz.  (Ex. 21.)

On September 13, 2005, Lange was formally charged with several disciplinary offenses.  (Ex. 22.)  That same day, he pled guilty to one of those charges, "possession of contraband."  (Id.)  It appears that he was sentenced by Lieutenant Maddox to 15 days of segregated confinement, and that his sentence was suspended, provided he had no further infractions during the next 90 days.  (Id.)

Lange's Work Assignment History Report shows that he was barred from working between September 5, 2005, and September 19, 2005, and again between October 12, 2005, and December 11, 2005.  (Ex. 20.)  Defendants contend that Lange, (like Scott), was barred from working during those two periods because of his misconduct in the kitchen.  Plaintiff again disagrees.  The Court finds that in the Lange matter, (like the Scott matter), the current record does not provide any explanation as to why Lange was laid off from work during the fall of 2005.  For the reasons set forth below, this fact dispute does not preclude the granting of Defendants' motion for summary judgment.

## II.  STANDARD OF REVIEW

In considering a motion for summary judgment, the Court is to determine whether there are any genuine issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317

8

(1986); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986); <u>Matsushita Electric Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574 (1986).  When there is no reasonable construction of the facts that would allow the nonmoving party to prevail, the remedy of summary judgment is appropriate.  <u>Matsushita</u>, 475 U.S. at 587-88.  The role of the court is not to weigh the evidence, but to determine whether, as a matter of law, a genuine factual conflict exists.  <u>AgriStor Leasing v. Farrow</u>, 826 F.2d 732, 734 (8th Cir. 1987).  In making this determination, the court is required to view the evidence in the light most favorable to the nonmoving party and to give that party the benefit of all reasonable inferences that can be drawn from the evidence.  <u>Id</u>.

On a motion for summary judgment, the moving party has the initial burden of establishing the "material facts" and demonstrating that there is not a "genuine" dispute as to whether those material facts are true.  Fed. R. Civ. P. 56(c).  To defeat the motion, the opposing party must then establish that there is a "genuine" issue as to material facts.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  <u>Matsushita Elec. Indus. Co. Ltd.</u>, 475 U.S. at 586; Fed. R. Civ. P. 56(e).  If a motion for summary judgment is properly supported by affidavits or other evidence, the nonmoving party must set forth specific facts, by affidavits or otherwise, showing that there is a genuine issue for trial.  <u>Id</u>. at 587; <u>Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.</u>, 824 F.2d 582, 585 (8th Cir. 1987), <u>cert</u>. <u>denied</u>, 484 U.S. 1010 (1988).  Although the evidence is examined in the light most favorable to the non-moving party, the non-moving party may not rely on conclusory allegations or denials.  <u>Anderson</u>, 477 U.S. at 256; <u>Lambert v. City of Dumas</u>, 187 F.3d 931, 934-35 (8th Cir. 1999).

9

The moving party is entitled to summary judgment when the non-movant fails to establish the existence of an essential element of a claim on which that party has the burden of proof at trial. Celotex Corp., 477 U.S. at 322. No genuine issue of material fact exists absent such foundation because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co., 475 U.S. at 587. The Court considers the motion for summary judgment based upon the material presented in connection with the motion. "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson, 477 U.S. at 250. The Court's inquiry should be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52.

The Court is mindful that pro se pleadings should be liberally construed. Haines v. Kerner, 404 U.S. 519, 520 (1972); White v. Bond, 720 F.2d 1002, 1003 (8th Cir. 1983). Therefore, pro se pleadings are held to less stringent standards when challenged by motions to dismiss or for summary judgment. Haines, 404 U.S. at 520; Horsey v. Asher, 741 F.2d 209, 211 n.3 (8th Cir. 1984). Nonetheless, a pro se plaintiff's claim cannot survive a motion for summary judgment unless, in some form, he can fairly be said to have set forth specific facts demonstrating that there is a genuine issue of material fact that requires a

10

trial.  <u>Miller v. Solem</u>, 728 F.2d 1020, 1023, (8th Cir.), <u>cert</u>. <u>denied</u>, 469 U.S. 841 (1984);

<u>Quam v. Minnehaha County Jail</u>, 821 F.2d 522 (8th Cir. 1987).

## III.  DISCUSSION

### A.  <u>Official Capacity Claims</u>

Plaintiff's amended complaint does not specifically indicate whether he is attempting

to sue the named Defendants in their official capacities, or their individual capacities.  Our

Court of Appeals has repeatedly held that if a plaintiff in a § 1983 case does not expressly

state that a defendant is being sued in his or her individual capacity, then the plaintiff's

claims are deemed to be brought against the defendant in his or her official capacity.  As

explained by the Court of Appeals, "in order to sue a public official in his or her individual

capacity, a plaintiff must expressly and unambiguously state so in the pleadings, otherwise,

it will be assumed that the defendant is sued only in his or her official capacity."  <u>Johnson</u>

<u>v. Outboard Marine Corp.</u>, 172 F.3d 531, 535 (8th Cir. 1999).  <u>See</u> <u>also</u> <u>Artis v. Francis</u>

<u>Howell North Band Booster Ass'n., Inc.</u>, 161 F.3d 1178, 1182 (8th Cir. 1998) ("[i]f the

complaint does not specifically name the defendant in his individual capacity, it is presumed

he is sued only in his official capacity"); <u>Andrus ex rel. Andrus v. Arkansas</u>, 197 F.3d 953,

955 (8th Cir. 1999) ("if a complaint is silent, or only hints at the capacity in which a state

officer is sued for monetary damages, the complaint should be interpreted as an

official-capacity claim....[;] [i]n actions against officers, specific pleading of individual

capacity is required to put public officials on notice that they will be exposed to personal

liability") (citing <u>Egerdahl v. Hibbing Community College,</u> 72 F.3d 615, 619 (8th Cir.1995),

and <u>Nix v. Norman</u>, 879 F.2d 429, 431 (8th Cir.1989)); <u>Lundak v. Nyseth</u>, Civil No. 04-4297

(JRT/FLN), (D.Minn. 2005), 2005 WL 2216313 at *2 ("[i]t is long established that a § 1983

litigant wishing to sue a government agent in his individual, as well as official, capacity must 'expressly and unambiguously state so in the pleadings'") (quoting <u>Johnson</u>, <u>supra</u>).[4]

Because Plaintiff has not expressly alleged that Defendants are being sued in their individual capacities, the Court must find, based on the well-established Eighth Circuit caselaw cited above, that Defendants are being sued only in their official capacities.

A § 1983 action brought against a government official in his or her official capacity is, in effect, a suit against the agency or entity that employs that person. <u>Kentucky v. Graham</u>, 473 U.S. 159, 165 (1985) ("[o]fficial capacity suits... 'generally represent only another way of pleading an action against an entity of which an officer is an agent'"), quoting <u>Monell v. New York City Dept. of Social Services</u>, 436 U.S. 658, 690, n. 55 (1978). "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." <u>Kentucky v. Graham</u>, 473 U.S. at 166. For this reason, official capacity suits brought against agents or employees of a state are considered to be actions against the state itself. <u>Will v. Michigan Dept. of State Police</u>, 491 U.S. 58, 71 (1989) ("a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.... [and] [a]s such, it is no different from a suit against the State itself") (citation omitted).

Because official-capacity suits against state officials, such as Defendants in this case, are treated as actions against the state itself, such actions are subject to the restrictions of the Eleventh Amendment. Under the Eleventh Amendment, states are

---

[4]   <u>See also</u> <u>Maestas v. Hvass</u>, Civil No. 99-1366 (JRT/ESS) (D.Minn. 2000) (Tunheim, J.), Order dated September 6, 2000, (Docket No. 12), at p. 3.

immune from suits brought against them in federal court, unless the state's immunity has been waived or overridden by Congress. Id. at 66. The Supreme Court has found Eleventh Amendment immunity to be fully effective in § 1983 actions. Id. ("Congress, in passing § 1983, had no intention to disturb the States' Eleventh Amendment immunity"). It follows that official-capacity suits against state officials, such as the one now before this Court, are barred by the Eleventh Amendment -- with one exception. Official capacity suits for prospective relief can be brought against state officials. Hopkins v. Saunders, 199 F.3d 968, 977 (8th Cir. 1999) ("Eleventh Amendment protects a state official sued in his official capacity from all claims except for certain forms of prospective equitable relief"), cert. denied, 531 U.S. 873 (2000); Andrus, 197 F.3d at 955 ("Eleventh Amendment does not bar official-capacity claims for injunctive relief against state officials"); see also Will, 491 U.S. at 58, n. 10 ("a state official in his or her official capacity, when sued for injunctive relief, would be a person [who could be sued] under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State'") (quoting Kentucky v. Graham, 473 U.S. at 167, n. 14); Nix, 879 F.2d at 432 ("[a] state agent... may be sued in his official capacity if the plaintiff merely seeks injunctive or prospective relief for a legally cognizable claim").

Thus, to the extent that Plaintiff in this case is attempting to sue Defendants for money damages, his official capacity claims are barred by the Eleventh Amendment. Andrus, 197 F.3d at 955 ("[a] claim for damages against a state employee in his official capacity is barred under the Eleventh Amendment"); Arizonans for Official English v. Arizona, 520 U.S. 43, 69, n. 24 (1997) ("State officers in their official capacities, like States themselves, are not amenable to suit for damages under § 1983"). Plaintiff can sue

13

Defendants in their official capacities only for injunctive relief.

Plaintiff's original complaint does indicate that he "seeks injunctive relief," as well as money damages.  (Complaint, [Docket No. 1], p. 4, § V.)  When Plaintiff executed that pleading, on September 25, 2005, (id.), he was still suspended from holding any prison job, because of the kitchen misconduct incident.  It therefore appears that the "injunctive relief" Plaintiff must have been seeking when he commenced this action was reinstatement of his eligibility for a work assignment.  There is nothing in the record to suggest that he could have been seeking any other form of injunctive relief.  However, after Plaintiff commenced this action, he regained his eligibility for prison work assignments, and he was, in fact, given such assignments.  Therefore, Plaintiff's only viable request for injunctive relief, i.e., that he be allowed to return to work, has become moot.[5]

Furthermore, even if Plaintiff were still seeking some form of injunctive relief that has not become moot, he has not pleaded any facts that would warrant any such relief.  To state an actionable claim for injunctive relief against state actors who are sued in their official capacities, a plaintiff must show that his federal constitutional rights are being violated because of some particular state policy or custom.  Hafer v. Melo, 502 U.S. 21, 25 (1991) ("[b]ecause the real party in interest in an official-capacity suit is the governmental entity and not the named official, 'the entity's 'policy or custom' must have played a part in

---

[5] Plaintiff's response to Defendants' summary judgment motion specifically mentions that he originally "requested that injunctive relief be grated [sic]," as well as money damages. (Plaintiff's "Response To Memorandum In Support Of Motion For Summary Judgement," [Docket No. 57], p. 4.)  However, that response does not indicate that Plaintiff was ever seeking any injunctive relief other than reinstatement of his eligibility for work assignments, or that he is still seeking injunctive relief at this time.  Thus, it appears that Plaintiff must now be seeking only "nominal damages" and "punitive damages."  (Id.)

the violation of federal law'") (citations omitted); <u>Grayson v. Ross</u>, 454 F.3d 802, 810 -11 (8th Cir. 2006) ("[o]fficial-capacity liability under 42 U.S.C. § 1983 occurs only when a constitutional injury is caused by '<u>a government's</u> policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy'") (quoting <u>Monell</u>, 436 U.S. at 694) (emphasis added).

In this case, there are no allegations in Plaintiff's amended complaint, and there is no evidence in the record, which would suggest that Plaintiff's constitutional rights are being violated by Defendants' execution of a policy or custom adopted by the State of Minnesota. Therefore, even if Plaintiff were still seeking some viable form of injunctive relief in this action, his claim would have to be summarily dismissed, because he has not presented any facts to support such a claim.

In sum, the Court finds that Plaintiff is suing Defendants only in their official capacities, and the Court further finds that Plaintiff has failed to present an actionable official capacity claim for two reasons. First, because Defendants are state actors, the Eleventh Amendment prohibits official capacity claims against them for money damages; and while Defendants could be held liable in their official capacities on claims for injunctive relief, the only such claim presented in this case was rendered moot when Plaintiff regained his eligibility for prison work assignments. Second, even if Plaintiff could identify some still viable request for injunctive relief, his official capacity claims against Defendants would still have to be summarily dismissed, because there are no allegations or evidence in the record, which suggest that Defendants are violating Plaintiff's constitutional rights by executing a policy or custom adopted by the State of Minnesota. Thus, the Court concludes that all of Plaintiff's claims against Defendants must be summarily dismissed.

15

B.  Individual Capacity Claims

Because Plaintiff has sued Defendants only in their official capacities, and Plaintiff's official capacity claims must be dismissed for the reasons explained above, this action could properly be dismissed without any further discussion.  However, Plaintiff should not be left with the misimpression that he lost this case solely because of a technical pleading error, (i.e., because he sued Defendants only in their official capacities), or that he might be able to resurrect his lawsuit, if he could amend his pleadings to specifically indicate that he was suing Defendants in their individual capacities.  In order to put those possible misimpressions to rest, the Court will explain why Plaintiff's due process and equal protection claims would have to be dismissed even if Defendants were sued in their individual capacities.

**(i) Due Process Claim**

To maintain an actionable due process claim, a prisoner must allege, (and ultimately prove), that he has been deprived of some constitutionally protected liberty or property interest.   Ragan v. Lynch, 113 F.3d 875, 876 (8th Cir. 1997) ("[a] due process claim is cognizable only if there is a recognized liberty or property interest at stake").  In prisoner cases, a constitutionally protected interest will be found, and the protections of due process will therefore come into play, only when the prisoner can show that he has suffered the type of unusual hardship, or dramatic departure from ordinary prison life, that was contemplated by the Supreme Court in Sandin v. Conner, 515 U.S. 472 (1995).

In Sandin, the Court held that a prisoner cannot sustain a due process claim unless he can show that he suffered an "atypical and significant hardship... in relation to the ordinary incidents of prison life." Id. at 484.  Our Court of Appeals has interpreted Sandin

16

to mean that prisoner due process rights are implicated only when there have been "deprivations which work such <u>major disruptions</u> in a prisoner's environment and life that they present <u>dramatic departures</u> from the basic conditions and ordinary incidents of prison sentences." <u>Moorman v. Thalacker</u>, 83 F.3d 970, 972 (8th Cir. 1996) (emphasis added).

Plaintiff cannot sustain a due process claim here, because there are no facts showing that he has been subjected to the type of severe hardship that <u>Sandin</u> requires. The only relevant "hardship" in this case is Plaintiff's temporary loss of his work assignment. However, the loss of a prison job does <u>not</u> constitute the type of dramatic departure from the ordinary conditions of prison life that was contemplated by the Supreme Court in <u>Sandin</u>.[6]

While Plaintiff obviously is upset about losing his prison job, he did not suffer the type of serious hardship that could substantiate a due process claim. Prisoners are frequently denied employment opportunities for many different reasons, and such events are not considered to be an "atypical and significant hardship" or a "dramatic departure" from the ordinary conditions of a prison sentence. Federal courts have consistently held that the "denial of employment opportunities to an inmate does not impose an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" <u>Penrod</u>

---

[6] Plaintiff's due process claim appears to be based solely on the termination of his employment, and not on his term of segregated confinement. If Plaintiff were claiming that his constitutional rights were violated because he was placed in segregated confinement without due process, that claim would fail. It is well-settled that segregated confinement is <u>not</u> a hardship that can give rise to an actionable due process claim. <u>Portley-el v. Brill</u>, 288 F.3d 1063, 1065 (8th Cir. 2002) ("[w]e have consistently held that administrative and disciplinary segregation are not atypical and significant hardships under <u>Sandin</u>"); <u>Kennedy v. Blankenship</u>, 100 F.3d 640, 642 n. 2, 643 (8th Cir.1996) (placement in punitive isolation was not atypical and significant deprivation, even though prisoner faced restrictions in mail, telephone, visitation, and commissary privileges).

v. Zavaras, 94 F.3d 1399, 1407 (10th Cir. 1996), quoting Sandin, 515 U.S. at 484.  See also

Callender v. Sioux City Residential Treatment Facility, 88 F.3d 666, 669-70 (8th Cir. 1996);

Freitas v. Ault, 109 F.3d 1335, 1338 (8th Cir. 1997); Dominque v. Weld, 73 F.3d 1156,

1161 (1st Cir. 1996); Bulger v. United States Bureau of Prisons, 65 F.3d 48, 50 (5th Cir.

1995).  Thus, according to Sandin, Plaintiff had no constitutionally protected interest in his

job in the kitchen at MCF-RC – or any other work assignment.  See Burton v. Evans, No.

01 C 3328 (N.D.Ill. 2002) 2002 WL 832590 at *5 ("[a] prisoner's interest in having a job is

not protected as a liberty interest by the Due Process Clause").

Because Plaintiff's interest in retaining his prison job was not a constitutionally

protected liberty or property interest, he could be removed from his work assignment with

being afforded the procedural benefits of due process.  See Nash v. Wilkinson, 124

Fed.Appx. 254, 255 (5th Cir. 2005) (prisoner "had no liberty interest in his work assignment,

family visits, or his housing assignment and, thus, cannot complain about any lack of

procedural due process in connection with the loss of those privileges") (citing Sandin);

Anderson v. Colorado Dept. of Corrections, No. 98-1477 (10th Cir. 1999), 1999 WL 387163

at *1 ("because neither the loss of a prison job nor the loss of an opportunity to earn good

time credits constitutes any atypical or significant hardship upon the petitioner in relation

to the ordinary incidence of prison life sufficient to create a liberty interest, these allegations

do not state a claim for a due process violation"), cert. denied, 528 U.S. 1165 (2000).

Thus, even if Plaintiff had sued Defendants in their individual capacities, his due process

claims would still be dismissed.

### (ii) Equal Protection Claim

Plaintiff claims that he was deprived of his constitutional right to equal protection, because he was disciplined more severely than other inmates, due solely to his race and religion. The only evidence that Plaintiff has offered in support of this claim is the evidence suggesting that he was disciplined more severely than two fellow inmates who are not the same race or religion as Plaintiff.

Defendants contend that those other inmates, Scott and Lange, received the same discipline as Plaintiff. Plaintiff disagrees, claiming that Scott and Lange regained their eligibility for work assignments more quickly than he did. This is a factual dispute that cannot be fully resolved based solely on the evidence now before the Court. However, this factual dispute does not preclude summary judgment, because even if the issue is resolved in Plaintiff's favor – i.e., even if Scott and Lange were disciplined less severely than Plaintiff – Plaintiff's equal protection claim still fails.

"The Fourteenth Amendment requires that the government 'treat similarly situated people alike,' a protection that applies to prison inmates." Murphy v. Missouri Dept. of Corrections, 372 F.3d 979, 984 (8th Cir.), cert. denied, 543 U.S. 991 (2004), citing Rouse v. Benson, 193 F.3d 936, 942 (8th Cir.1999). However, a prisoner cannot sustain an equal protection claim merely by alleging that he has been treated less favorably than other inmates; he must show that his circumstances are the same as those of other inmates who purportedly received more favorable treatment. Bogren v. Minnesota, 236 F.3d 399, 408 (8th Cir. 2000) ("[i]n general, the Equal Protection Clause requires that state actors treat similarly situated people alike"), cert denied, 534 U.S. 816 (2001), citing Klinger v. Department of Corrections, 31 F.3d 727, 731 (8th Cir. 1994), cert. denied, 513 U.S. 1185

(1995).

If a prisoner's equal protection claim is based on alleged racial or religious discrimination, as is the case here, then the prisoner must show that he was treated differently <u>because of</u> his race or religion. <u>Foster v. Wyrick</u>, 823 F.2d 218, 221 (8th Cir. 1987) ("[p]roof of discriminatory racial purpose is required to establish an equal protection claim"). <u>See</u> <u>also</u> <u>Buckley v. Davis</u>, No. 94-1816 (8th Cir. 1995), (<u>per</u> <u>curiam</u>), 1995 WL 115603 (unpublished opinion) at *1 (prisoner's racial discrimination claim was properly dismissed because he "did not present sufficient evidence to show any intentional discrimination by defendants").

A comparison of Plaintiff's disciplinary incident to Scott's and Lange's – which is all that Plaintiff offers in support of his equal protection claim – does not adequately demonstrate that Defendants treated Plaintiff differently because of his race or religion.

None of the named Defendants was directly responsible for the sanctions imposed against Plaintiff, or Scott and Lange.  Plaintiff's only claim, therefore, is that Defendants violated Plaintiff's right to equal protection by failing to overturn the sanctions imposed against him by their subordinates, that were more severe than the sanctions imposed against Scott and Lange.  This argument fails, however, because the disciplinary incidents involving Plaintiff, Scott and Lange were not the same.  The three inmates were disciplined at different times, by different prison personnel, for different misbehavior.  There is nothing in circumstances surrounding the three incidents from which one could infer that the differences were based upon Plaintiff's race or religion.

In a prison setting, it is inevitable that inmates will be disciplined by different prison officials for different misconduct, and that different discipline will be meted out in different

20

matters.   It is therefore inevitable that some inmates will complain that they have been sanctioned more harshly than other inmates who committed different, but allegedly comparable, infractions.   In the absence of some evidence of illegal discrimination, complaints about different discipline are not actionable under § 1983.   "A few individual examples of unequal treatment are 'insufficient to provide more than minimal support to an inference of classwide purposeful discrimination.'"  Weiler v. Purkett, 137 F.3d 1047, 1052 (8th Cir. 1998) (quoting Inmates of Neb. Penal and Correctional Complex v. Greenholtz, 567 F.2d 1368, 1381 (8th Cir.1977), cert, denied, 439 U.S. 841 (1978).  See also Lyon v. Farrier, 730 F.2d 525, 527 (8th Cir. 1984) ("[t]o succeed on an equal protection claim," prisoners are "required to show that they received treatment which was invidiously dissimilar to that received by other inmates"); Ivey v. Ashcroft, No. 94-3358 (8th Cir. 1995), (per curiam), 1995 WL 486565 (unpublished opinion) at *1 (prisoners' "'race discrimination' claim" was properly dismissed on summary judgment, because "plaintiffs failed to rebut defendants' documentary evidence showing that plaintiffs were assigned to ad seg for legitimate, non-discriminatory reasons").

Plaintiff has not presented any evidence showing that any of the three named Defendants failed to correct the discrepancy in his discipline based on his race or religion. No such inference can be made based only on the evidence that Defendants' subordinates disciplined inmates Scott and Lange differently from Plaintiff.   Even if Plaintiff had sued Defendants in their individual capacities, the evidence of record would entitle them to summary judgment on Plaintiff's equal protection claim against them.

## IV. RECOMMENDATION

Based on the foregoing, and all the files, records and proceedings herein,

21

IT IS HEREBY RECOMMENDED that:

    1. Defendants' Motion For Summary Judgment, (Docket No. 52), be GRANTED; and

    2.  This action be DISMISSED WITH PREJUDICE.


Dated: <u>August 22</u>, 2007

                             <u>s/ *Franklin L. Noel*</u>
                             FRANKLIN L. NOEL
                       United States Magistrate Judge


Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **September 11**, **2007**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under the rules shall be limited to 3500 words. A judge shall make a de novo determination of those portions to which objection is made.   This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.